Good morning, Your Honors, and may it please the Court, my name is Anne Voits and I represent the government in this case. And with the Court's permission, I'd like to reserve three minutes for rebuttal. You have to keep track of your time. I will do. I will do my best, Your Honor. Fair. I'd like to begin by addressing the applicability of the public safety exception in this case, the first issue presented. And as an initial matter, I'd like to make clear exactly what the government is contesting. Specifically, the government is contesting only the suppression of the defendant's statements about the existence and whereabouts of the gun, not his statements either prior to entry or after the police entered the house about whether the gun was his. Our position is that the district court erred in concluding that the public safety exception did not apply because there was not an emergency because it neither focused on what the officers, in fact, knew at the time that they asked the questions or on the situation inside the house. What the district court did was it focused on the situation outside the house and concluded that because the officers had controlled that situation, there was no emergency. However, as this Court made clear in Allen, the applicability of the public safety exception turns on what the officers knew at the time of the question. What is it with you government attorneys today talking a million miles a minute? Slow down. I apologize, Your Honor. I'm trying to follow the argument. Slow down, please. Okay. With respect to the applicability of a public safety exception, the key question here is what the officers knew at the time. And what they knew at the time was that they had gotten a series of frantic 911 calls from the defendant's wife reporting a domestic violence incident. She had told them that she had a restraining order against her husband, that there was a rifle in the locked bedroom, and that her husband had the key to that bedroom. When they arrived, she further stated that she was outside the house. She'd fled after the first call, that her three-year-old daughter remained inside the house with the child, and that her daughter was in the front bedroom and that the gun was in the back. When they arrived on the scene and they spoke to her, she went into further detail. She said that the defendant had come home, that they had been in a fight, that during part of the fight, the defendant was in that bedroom removing her clothes, and that he at one point picked her up and choked her, at which point she fled the house and left him in. What the 911 operators reported to the officers was that a domestic violence emergency was occurring, that a firearm was in the bedroom, that the husband had the key, and that a three-year-old child was in another bedroom. In those circumstances, given that, given those facts, and given that the defendant's wife had said that she and the defendant had been in the bedroom during part of the fight, it was reasonable for the officers to ask about the existence and whereabouts of the gun. The key was that the wife had left the house, so they didn't, they couldn't find out from her whether it was still locked away. That's correct. Or not, or no longer locked away. That's correct. The key thing they couldn't know. That's correct. Because she had fled the house, I believe her first call was at about 5.02 in the morning. So they didn't know if the child was still in that bedroom. Right. Given that there had been a domestic violence incident going on, it sounds, it could potentially have been noisy with the arrival of the police, and the police then giving instructions to the defendant to exit the house. Well, he walked out about two minutes after the police arrived, didn't he? I mean, the dispatcher, as I recall, called the house and asked him to come out, because the police would be there. And he did that. What happened was the first call came, and I can refer the Court to the transcript begins on GER 133. Her first call came at about 5.02. It was subsequently disconnected, and then she called again. The defendant didn't, in fact, call 911. And he was, in fact, the one who called 911. It was not the 911 operator calling him. He called to find out if his wife had called 911 and reported this incident. And he did that, I believe it was at approximately 5.12. So there were about ten minutes, roughly, where he was alone in the house, you know, where he clearly suspected that his wife had contacted law enforcement and where the three-year-old child remained in the house with him. It was certainly enough time, given that they had been in the bedroom, for the police to wonder whether he had moved the gun or whether he had gotten it out at some point or tried to hide it. Okay. But then he came out, right? He did come out at that point. He came out after. Did the dispatcher ask him to come out? Yes. While the police were rolling towards the house, they asked the dispatcher to call and ask him to come out. Actually, what happened was he was on the phone with the 911 operator. The 911 operator then, about a minute into the call, called out to the units and said that they had the male half on the line now. And then Officer Morrison said, 14 copy, can you tell him to step outside? Okay. And at that point, the 911 operator went back to the call with Mr. Doble and said, are there weapons inside the res? And he said, yeah, well, yeah, there's a shotgun in the room. And the operator says, okay, all right, and he says, in the bedroom. And then she asks him again to step outside. And that's the point at which he steps outside. And then he was told to, I think, raise his hands and walk backwards, because he sounded a voice, and they handcuffed him. That is what the district court found, that he was asked to step outside, that they used a loud voice, and that they told him to walk backwards, and that he was then patted down. Is there a standard of review de novo? Yes, Your Honor, it is. And if the Court would like a cite, both United States v. Brady and United States v. Riley said that the applicability of the public safety exception is reviewed de novo. And the same standard also applies to the emergency exception, which, with the Court's permission, I'd like to address very quickly. Because there, again, as the Court can note by looking at the district court's order, the district court's conclusion in rejecting the applicability of the emergency exception to the entry into the house was based solely on the conclusion that there wasn't an emergency, which, in turn, was based solely on the situation outside of the house. Although in the findings of fact, the district court acknowledged that there was a child in the house, that's never factored into the actual analysis of whether either the public safety exception applied to defendant's statement or whether the emergency exception applied to permit the defendant to actually go inside the house. And in this case, the district court made a mistake on that. First, it focused, again, on what the officers knew before they actually went into the house, but upon what they ultimately found when they went in, which was that the gun was, in fact, behind a locked door. But that is clearly error under this Court's case law and under the Supreme Court's case law, because it is based on what the officers knew at the time. And second, the district court, as we've said, did not take into account either the fact that there was a 3-year-old child in the house with a potentially accessible shotgun or the fact that the entire context of a domestic violence incident in which the defendant could potentially have returned to the house after officers left and used the gun or had the gun used against him in self-defense by his wife. Well, the wife could have given him permission, police permission to go in the house. And in this case, because the officers mistakenly believed under California law that they had the right to go in and they also believed that they had gotten And if I may, I'd like to reserve the balance of my time for rebuttal. Thank you. Good morning. May it please the Court. Chase Gromick on behalf of Mr. Doble. The district court correctly suppressed Mr. Doble's statements that resulted from an unmerandized custodial interrogation, as well as the evidence obtained from a warrantless and unjustified search of his home. Now, at the core of this well-reasoned decision by the district court, there were factual findings. There were factual findings that at the time the officers were outside the home, there was no grounds to believe or there was no emergency. These factual findings. Is that a factual finding or is that a conclusion, a conclusion to be drawn from underlying facts like who was standing there where? Your Honor, that is a factual finding. The both parties cite Russell for the appropriate case for standard of review as to the emergency exception. And in Russell, the Court noted that findings of fact are reviewed in OVO and specifically says at 436, up third at 1092 to 1093, the district court did not clearly err in concluding that the officers had a reasonable grounds to believe that there was an emergency requiring immediate assistance. Therefore, this Court's precedent found that the finding that there was no grounds to believe there was an emergency was itself a factual finding entitled to clear a deference. And in this case, on this record, the government. Well, the officers had no way to know for sure whether the locked door had been unlocked before the defendant left the house, because there was a period of time during which he was the only adult in the house before they got there, correct? Well, that's unless they – I suppose that's true, but we have to base this on your Honor. Okay. Well, let me ask the next question then. If it was possible that he had unlocked the door before leaving the house, they also knew that there was a child who was, you know, presumably ambulatory at that age inside the house. And, you know, kids find guns if they're, you know, if they're not behind a locked door and they didn't know whether it was locked or not. And I'm not sure where that leaves us. Your Honor, I think what we have to do is look at the record and look at the facts that were known to the police officers at the time they were standing outside. Even before speaking with Mr. Goebel, the police officers were told by Ms. Goebel to the 911 operator that there was a gun behind the locked door. She reiterated that. And her husband had the key, and her husband with the key was alone in the house after she left the house. That's true. And locked doors can be unlocked with a key. That's true, Your Honor. But I'd like to refer the Court to pages 137 and 138 of the ER, where Mr. Goebel himself calls the 911 operator. Mr. Goebel himself wants to clear the air and ask what happened. He's speaking with the operator in a calm, cool, and cooperative manner. And he tells the operator that he confirms to the operator, in the district court's words, he confirms that the gun is in the room. So the basic, your basic theory is that the police were required as a matter of law, basically, to believe him when he said, oh, yeah, the door's still locked. No, that's not my position, Your Honor. What the police have to do is they have to assess the situation, and they have to base that on all the information known to them. Here we have Mr. Goebel saying that the gun's in the bedroom, confirming it. Ms. Goebel confirms that as well. And in Officer Morrison's words, moments after confirming that the gun was still there, he came right out of the house on page ER-129. So here the officers have two sources saying that the gun is in the bedroom. They have no information from Mrs. Goebel. But didn't Mr. Goebel, Mr. Goebel called 911 on a pretense. And that was kind of obvious, wasn't it? Because he asked the 911 operator, did my wife call you? And he was, you know, I don't know why it would be reasonable to believe his statement about the gun when he was the only person who had been alone in the house with the gun. Well, Your Honor, why would it be unreasonable to believe him? What reason did they have to believe that the gun moved in anyway? Because he had called the 911 operator to kind of, under pretense, to assess whether his wife had called on him and whether to lie about the incident, basically. Well, even if he were calling to lie about the incident, there's been no finding by the district court that that's what the case was. There's been no evidence to support that. That has nothing to do with him lying. Well, the transcripts are in the record. They are, Your Honor. But that has nothing to do with a motive or intent or reason to lie about the gun. I mean, here you have someone who is a felon. Well, you have two different stories. The wife's giving one story and the husband's giving another story. Not at that point, Your Honor. Well, certainly about the domestic violence, they're giving completely different stories. And if they believe the wife, this guy has been extremely violent within the last few minutes. Well, as to the location of the gun, the parties' stories are completely consistent. Both of the parties are saying that the gun's behind the locked door. Both of the parties, or at least Ms. Doble, confirmed that the child's in the front of the house. There's no indication. No one presented that. The government didn't present any evidence that the gun was anywhere but behind that locked door. And this is the information that's known. Well, what should the police have done then? The police could have done a number of things. They could have asked the wife, Ms. Doble, for consent to come in the house. They could have accompanied her to come inside the house. I suppose they could have tried to obtain some kind of a warrant. They could have done any number of things short of asking Mr. Doble questions without the benefit of a warrant. And I think the true emotional tenor of the situation is underscored by looking at the officers' actions themselves. Here the officers did not immediately begin questioning Mr. Doble as to the location of the gun. And what they began to ask Mr. Doble about is getting his side of the story. Well, the context is that probably the most dangerous call that an officer ever responds to is a domestic violence call. I mean, just from reading the statistics of when police officers get harmed. So it seems natural they would turn to that subject first. I don't know how that assists your argument, though. Well, Your Honor, they're not concerned about the gun. They're concerned more about obtaining evidence in relation to the domestic violence incident. And only after they get his side of the story do they begin to ask questions about the gun. Now, if we can at this point, because I see I have three minutes left, I'd like to shift gears to the Fourth Amendment analysis. Can I just ask you, is it one thing I find odd about the, and it applies to both analyses, about the district court opinion, is it completely omits as a factor the 3-year-old child who's in the house? Your Honor, with respect, I disagree. Twice during the arguments, and we're not dealing with a two-month trial here. We're dealing with a record, a hearing that only took about two hours. Twice or three times during the hearing, the court interrupted the parties to ask specifically about the child. But his opinion doesn't mention. It doesn't factor, does the child add to the dangerous situation or the emergency situation? But it does, Your Honor. On page 4 of the excerpt of the record, the Court notes that they were told the child was in the front room of the house and that the gun was behind the, and on page 8, the Court notes and makes a finding that the gun was in the back room of the house. That's what they were told. So there wasn't a concern to the Court. The Court did analyze it and note that. It's really not understanding what 3-year-olds are like. 3-year-olds don't stay put. But 3-year-olds cannot get to the other side of the locked door without a key. But they're assuming that the gun is still there. There's no information to the contrary, Your Honor. Well, that gets back to my initial question. He was alone in the house with the key for a period of time during which no other adult could vouch for the fact that he hadn't unlocked that door. Except for him. Well, but that then says, okay, you've got to believe this guy. That sort of undoes the whole exception, it seems to me. But, Your Honor, here we have a statement where someone's admitting to the knowledge and location of a gun. This is a statement by a felon. That's so, it's an admission at that point. It's so inherently. So why are they supposed to believe him on that when he's lying about the domestic violence? Well, at least as to this statement, that's an admission, a statement that's so inherently reliable that Congress has carved out an exception to the hearsay rule to allow these types of statements in a trial. This is the same exact, it's due to the inherent reliability of the statement, that it is admissible. And in this case, it was inherently reliable. And it was further compounded, the reliability, by Mr. Global's statements confirming that the gun was in the room and giving them a key to the room. Now, it's partly inculpatory, as you've said, but it's also partly exculpatory, because if he had, in fact, unlocked the door and the child were there, that would make him look much worse than saying, oh, yeah, it's there, but it's locked, it's okay. So, you know, it's still to his benefit to have them believe that it's behind a locked door, because he looks less dangerous, et cetera, et cetera. Well, that has nothing to do with the, his culpability has to do with guns. It has to do with whether his statement is so inherently reliable that every bit of it has to be believed. Perhaps the best judge of whether or not the statement was inherently reliable are the people who actually heard. The police officers here, you have five trained, experienced police officers, have the ability to assess the situation, his credibility, the wife's credibility, and they went directly into the house. They didn't stop at the child, because they knew the child in the front bedroom was in no danger of a gun behind the locked back bedroom door. Now, when the officers got to the... I mean, they were partly, I mean, they were testing to see if it was there, because Mr. Doble's knowing that he's a felon knows he's not supposed to have a gun. Wouldn't he have incentive to go get rid of the gun or hide it or do something else? Well, Your Honor, I'd like to focus on the point where the officers reached the back door and discovered that it's locked. They have independent corroboration that Mr. Doble's story is true. And even if they felt that the gun was somewhere else in the house, which there's no evidence that they did, whatever's behind the locked door would clearly be beyond the scope of any emergency to the child who wouldn't have access to get there. No. The point is if they corroborate by opening it and seeing that it is there, then they can rest easy that the child isn't in the same room with it. But they don't know until they see it. That's the case. Your Honor, whatever's behind that locked door, once they reach the door and find out that it's locked, they should rest assured that the child can't get there. Not taking the gun out and relocking the door. I mean, it's... I suppose that they could have then gone and get the child, Your Honor. They could have then gone directly to get the child. But the point is, whatever's... I don't think the locked door tells them anything. Well, the locked door does tell them that whatever's in there is not accessible to the child. So perhaps they could have gotten the child at this point if they walked right by. But somehow they have to know what's in there. Is the gun still in there? But, Your Honor, with all due respect, it doesn't really... This is corroboration. The gun isn't there. But even if the gun isn't in there, they've got no basis to associate whatever's in that room with the danger to the child who has no ability to access that room. This is why that search at that point was well beyond the scope of any danger to the child. And that is... Although the government's trying to read out the scope requirement of this rule by saying that it's some sort of a least intrusive means analysis, this court in Snipes specifically required a scope analysis. And the scope analysis in this case prohibits the government from going anywhere beyond what's necessary. What did he say when he gave the officers the key to that back bedroom? Your Honor, he said that, according to the record, this is a... The gun's in the back room. I gave them the exact location of the gun in the government's own witness's words and confirmed that the gun was there, reiterated that the gun was there, and then told them, you're going to need the key if you want to get the gun. So, again, this... Yes, and he gave them the key? Yes, Your Honor. And he gave them the key. So under these circumstances, we're dealing again with someone... A statement that's so reliable that Mr. Goble knew at that point that the officers were going to go inside the house. They were going to take the key from him, and they were going to go inside. He knew that they were going to find the gun at that point. So there would be no incentive for him to lie at that point because the truth would be discovered, and he had everything to gain by being cooperative. In this case, he was... Couldn't that be construed as an applied consent when he hands the officer the key? Well, Your Honor, one of the government's justifications for the search at the lower court was consent, but the district court made a finding that the consent was coerced by a show of police force, on, I believe, page 10 of the record. That's not been appealed. Correct, Your Honor. The government hasn't even raised that on appeal. So they can't rely on any other justification. They must rely on an emergency. And in this case, none of the officers believe there's an emergency. It's an emergency that was created entirely for the purposes of responding to Mr. Goble's motion to suppress at trial. And under these circumstances, the government has not met its burden. The district court has not clearly erred in making the finding that there is no emergency. And for these reasons, I would ask this Court to uphold the district court's order suppressing evidence. If the Court has any other questions, I'd be happy to address them. Okay. Thank you. If I might address three points briefly raised by defense counsel. First, with respect to the comment that none of the officers believed that there was an emergency. As an initial matter, as a legal matter, that's irrelevant. The Court is required to consider the objective facts, not the subject effects. But even if the Court were to look at that, we think that it does suggest that the officers were in fact concerned. They ordered the defendant to come out with his hands up. They had him walk backwards. They clearly were concerned about the risk in this case. With respect to what the defendant said to the 911 operator, he said that the gun was in the back bedroom, but he doesn't say it's locked. And as the Court pointed out, he also tried to diminish his culpability first with the 911 operator by saying, well, my wife, we're in the middle of a nasty divorce. I'm sorry. He tried to minimize his responsibility or his involvement by first saying, well, my wife is calling because we're in the middle of a nasty divorce. He subsequently denies to the officers that he engaged in any physical violence against his wife. Given those facts, it was reasonable for an officer first to ask about the existence and whereabouts of the gun, and then not to necessarily believe the defendant when he said something that fit with his pattern of making self-serving statements. What about when he turned over the key to them? At that point, well, there are two concerns. One, that he's lying, and second, that he could also have been mistaken. You have the wife's statement that they had actually been in that back bedroom during the fight. So at some point it clearly had been unlocked. And in that sort of volatile emotional situation, it's entirely possible for somebody to shut the door and think that perhaps they'd locked it but not remember precisely. So given those circumstances, I think it was reasonable for the officers to go in. As to whether they had to stop at the locked door, then I think the question is, you know, again, the gun could have been moved. It could have been put elsewhere. Is it less intrusive for them to go in and check that the gun is there or to search the entire rest of the house? And I think, as we pointed out in both our opening and in our reply brief, the Court has consistently been concerned about second-guessing what officers do in these sorts of situations because they are so volatile and so dangerous. And so in those circumstances, we believe the district court erred in applying hindsight to conclude that based on the fact that ultimately the gun was found behind a locked door, that the emergency exception did not justify the entry. If there are no further questions, I'd be happy to submit them. Thank you. That is vivid and deliberate. File 1, U.S. v. Martinez.
judges: Pregerson, Graber, Wardlaw